<pre>
 1                    UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF MASSACHUSETTS

 3

 4                                   )
 5   UNITED STATES OF AMERICA,       )
                                     )
 6           Plaintiff,              )
                                     )   Criminal Action
 7   v.                              )   No. 1:19-cr-10332-RWZ-1
                                     )
 8   DAVID HEBERT,                   )
                                     )
 9           Defendant.             )
                                     )

10

11

12             BEFORE THE HONORABLE RYA W. ZOBEL
                 UNITED STATES DISTRICT JUDGE

13

         WAIVER OF INDICTMENT AND PLEA TO INFORMATION
14

15
                      September 17, 2019
16                       11:07 a.m.

17
             John J. Moakley United States Courthouse
18                      Courtroom No. 12
                       One Courthouse Way
19                Boston, Massachusetts 02210

20

21
                      Linda Walsh, RPR, CRR
22                    Official Court Reporter
         John J. Moakley United States Courthouse
23            One Courthouse Way, Room 5205
               Boston, Massachusetts 02210
24               lwalshsteno@gmail.com

25
</pre>

```
 1    APPEARANCES:

 2    On Behalf of the Government:

 3         UNITED STATES ATTORNEY'S OFFICE
           By: AUSA Zachary R. Hafer
 4         One Courthouse Way
           Boston, Massachusetts 02210
 5         617-748-3106
           zachary.hafer@usdoj.gov
 6
      On Behalf of the Defendant:
 7
           BRAD BAILEY LAW, P.C.
 8         By: R. Bradford Bailey, Esq.
           44 School Street, Suite 1000B
 9         Boston, Massachusetts 02108
           781-589-2828
10         brad@bradbaileylaw.com

11

12

13
                   Proceedings reported and produced
14                  by computer-aided stenography

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  This is United States versus David Hebert,
 3    and it's Criminal 19-10332.
 4              Could I ask counsel to identify themselves for the
 5    record, please.
 6              MR. HAFER:  Good morning, Your Honor.  For the United
 7    States, Assistant U.S. Attorney Zack Hafer.
 8              MR. BAILEY:  Good morning, Your Honor.  Brad Bailey
 9    for David Hebert, who is present beside me at counsel table.
10              THE COURT:  I hardly recognized you.
11              MR. BAILEY:  I'm changing.
12              THE COURT:  You look good.
13              MR. BAILEY:  Thank you, Your Honor.
14              THE COURT:  I think the first issue is that there's a
15    plea agreement.
16              MR. HAFER:  Yes, Your Honor.
17              THE COURT:  And as I understand, Mr. Hebert, this is
18    your new version, and it's certainly better than the old
19    version --
20              MR. HAFER:  It is.
21              THE COURT:  -- but I still have questions.  First,
22    there is nothing said about restitution.
23              MR. HAFER:  That's correct, Your Honor.  There's
24    forfeiture.  There's not restitution here.  There's a
25    forfeiture agreement, but there's not restitution beyond --
```

1          THE COURT:  What does that mean with respect to what

2    happens to any money that is -- or it's a money judgment

3    forfeiture.  What happens the money?  Does it go back to the

4    people from whom it was taken or does the government keep it?

5          MR. HAFER:  No.  Here it will go to the government's

6    sort of general fund for any time it forfeits money.

7          THE COURT:  So the people who paid don't get anything

8    back.

9          MR. HAFER:  Correct, Your Honor.  Under this

10   agreement, under this portion of this agreement today, that is

11   correct with respect to this money.

12         THE COURT:  And will the government ultimately seek

13   some kind of a restitution order in this case?

14         MR. HAFER:  In this case I think no.  The larger

15   case --

16         THE COURT:  I'm not talking about the larger.

17         MR. HAFER:  In this case I do not anticipate there

18   being restitution.

19         THE COURT:  And then the other thing is the perennial.

20   What is the consideration?  There's reference to consideration

21   for the waiver of appellate rights, but what is that

22   consideration?

23         MR. HAFER:  I know we've had this conversation before.

24   I know we don't see it exactly the same, but what I will say

25   again here is Mr. Bailey and I engaged in extensive

1    conversations about the scope in terms of this agreement.  And

2    there are no, obviously, promises, rewards or inducements that

3    are not in the agreement, but we agreed that, given the

4    position the government was taking on the guidelines, the

5    agreement that the government would recommend a low end of the

6    guidelines sentence, and the terms and position on forfeiture,

7    that in return for that -- and the reciprocal appellate waiver

8    that the government is also agreeing to, that as part of the

9    gestalt of negotiations here, the appeal waiver was part of the

10   consideration in return for low end, reciprocal waiver,

11   forfeiture, and position on the guideline.

12           THE COURT:  Reciprocal waiver of?

13           MR. HAFER:  Reciprocal of waiver.  This isn't one -- I

14   know Your Honor at times has been presented with plea

15   agreements from us where it's a one-way waiver.  Only the

16   defendant is waiving appellate rights, and here the government

17   is also waiving any appellate rights.

18           THE COURT:  Well, only to the extent of a sentence.

19           MR. HAFER:  Well, yes, with the same range, but that

20   is correct.

21           THE COURT:  Mr. Bailey, what is your position?  I

22   guess you do have to do what the government says.  That's the

23   problem with these agreements.

24           MR. BAILEY:  Well, it is, Your Honor, on a sort of

25   theological basis, I guess, but this is the product of

```
 1    negotiation, and the government has accurately represented --
 2              THE COURT:  Well, the government has all the horses.
 3              MR. BAILEY:  That's accurate.
 4              MR. HAFER:  Only when the evidence is good, Your
 5    Honor.
 6              MR. BAILEY:  And having once been the government, I
 7    can't disagree with that, Your Honor.
 8              THE COURT:  All right.  Now, Mr. Hebert -- is that how
 9    you pronounce your name?
10              THE DEFENDANT:  Hebert, yes, Your Honor.
11              THE COURT:  Hebert?
12              THE DEFENDANT:  Yes.
13              THE COURT:  I understand that you are prepared to
14    offer a plea of guilty to this information which charges you in
15    three counts with various violations of the criminal code.
16    Namely, that you participated in a conspiracy to extort money
17    from certain marijuana places; that you did in fact extort
18    money is Count 2 from these places; and third, you ultimately
19    made false statements under oath to government agents.  Those
20    are the three charges.  Do you understand that?
21              THE DEFENDANT:  Yes, Your Honor.
22              THE COURT:  Now, the way we will proceed -- first, let
23    me explain to you that you are offering to plead guilty.
24    Before I can accept that offer, I need to ask -- I need to make
25    sure, number one, that you understand the nature of the
```

1    charges, that you understand what you're giving up by pleading

2    guilty.  I have to make sure that you're doing it voluntarily

3    and not under some compunction or compulsion, and finally, I

4    have to make sure that you did in fact do what the government

5    has accused you of doing.

6           And in a proceeding like this, which is not a trial,

7    where witnesses come and are questioned, the only way to do

8    that is by asking you the questions that lead me hopefully to

9    the answer that we want.  Do you understand that?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  And before we get to the questions, the

12   clerk will swear you, and you should also understand that once

13   you've taken the oath, if you knowingly give false answers to

14   any of the questions, the government has the option also of

15   prosecuting you for perjury.  Do you understand that?

16          THE DEFENDANT:  Yes, Your Honor.

17          THE COURT:  Do you want to go ahead?

18          THE DEFENDANT:  Yes, Your Honor.

19          THE CLERK:  Mr. Hebert, to these three counts of this

20   information charging you at 18 U.S.C. 1951, extortion

21   conspiracy; Count 2, 18 U.S.C. 1951, extortion and aiding and

22   abetting; and Count 3, sir, 18 U.S.C. 1001(a)(2), false

23   statements, sir, how do you plead to these three counts of this

24   information, guilty or not guilty?

25          THE DEFENDANT:  Guilty.

```
1              THE CLERK:  Could I ask you to raise your right hand.

2              (Defendant sworn.)

3              THE DEFENDANT:  I do.

4              THE CLERK:  Thank you, sir.  You can be seated, sir,

5    and just speak into the mike for the questions from the Judge,

6    please.

7              MR. BAILEY:  Your Honor, not really my place, but we

8    might have put the cart before the horse.  I don't think he's

9    executed the waiver of indictment.

10             THE COURT:  You're right.  Thank you.  So please sit

11   down.  We'll do that one, too.

12             Before you sign that, Mr. Hebert, understand that you

13   have a right under the Constitution not just to a trial, which

14   we're going to talk about a little later on, but also you have

15   a right to insist that if the government is going to accuse you

16   of a felony, that it first go to a body of 21, I think, or 23

17   citizens who are called a grand jury.  And they hear only what

18   the government offers -- provides to them in the way of

19   evidence, but then they decide whether, based on what they have

20   heard in the way of witnesses and have seen in the way of

21   documents, whether they are persuaded that there is probable

22   cause to believe that you did commit these offenses.  They do

23   not find you guilty.  They simply determine whether there is

24   probable cause to accuse you, and then if they find there is

25   such, then they will sign -- their foreperson will sign a
```

1    document called an indictment.

2           You have a right to waive this procedure and agree

3    that the government may just charge you by saying here is a

4    document that accuses you, but that one we don't call an

5    indictment, we call it an information, but it bypasses that

6    right that you have to insist that the government first go

7    before a grand jury and have them decide whether you should be

8    accused.  Do you understand that?

9           THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  And you're willingly giving up that right?

11          THE DEFENDANT:  Yes, Your Honor.

12          THE COURT:  Okay.  Thank you, Mr. Bailey.

13          MR. BAILEY:  You're welcome, Your Honor.

14          THE COURT:  All right.  Now, we have taken the oath,

15   right?

16          THE CLERK:  Yes.

17          THE COURT:  So, Mr. Hebert, the government has accused

18   you with three different counts.  I have trouble seeing them.

19   It has accused you of extortion conspiracy, substantive

20   extortion, and false statements, as I previously explained.

21   What it has to prove with respect to the conspiracy is what has

22   to be proven on every conspiracy.  It has two elements.  One,

23   that there was an agreement between two or more people to do

24   something illegal, in this case to try to extort money from the

25   marijuana people.  And in this case also there is the -- and

1    the second element is that you willingly and with an

2    understanding of what this agreement was about joined in it.

3    Do you understand that that's -- those are the two major

4    elements of any conspiracy?

5             THE DEFENDANT:  Yes, Your Honor.

6             THE COURT:  Now, in this case because it is a specific

7    conspiracy to commit extortion, the government also has to

8    prove that you acted under some kind of official right or that

9    it was some kind of an official act on behalf of the City of

10   Fall River.  Do you understand that that's another element?

11            THE DEFENDANT:  Yes, Your Honor.

12            THE COURT:  That's what the government has to prove.

13            THE DEFENDANT:  Yes, Your Honor.

14            THE COURT:  And, finally, it has to prove that in some

15   way this entire -- this transaction, in the course of this

16   transaction affected interstate commerce.  The Federal Courts

17   have jurisdiction only of cases that arise under Federal law or

18   that have some -- that have some impact on interstate commerce.

19   The Interstate Commerce Clause is very broad, and in this case,

20   to the extent there may have been transactions that involved or

21   potentially involved a product -- commerce between states, like

22   selling marijuana from one or buying marijuana in New York and

23   selling it here, the government has to prove that there was

24   some impact on that commerce among states in connection with

25   this conspiracy.  Do you understand?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Indeed, it is -- this is equally as

3    truthful for the second count.  Now, the second count charges

4    you with extortion.  And here it has to prove, number one, that

5    you obtained property from somebody else that was -- with that

6    person's consent; that you obtained it under, again, under

7    color of official right but as somebody who was representing

8    the City of Fall River or its mayor; and, again, that there was

9    an effect or an interruption or interference with interstate

10   commerce, which has the same element as I previously explained.

11   So that's the second count.

12          The third count says that you made false statements --

13   I have forgotten the date.  That on or around -- in January of

14   2019 you made statements.  It doesn't say to whom, but to

15   somebody within the jurisdiction of the executive department,

16   which presumably is the FBI or some other arm of law

17   enforcement, and that that statement was false; that it was

18   material, that is, it was something that was important for that

19   FBI agent or whatever to know in the course of his or her

20   investigation; and that you knew what you were doing.  You

21   acted knowingly and willfully, that you didn't make these

22   statements by accident and that you made them with the intent

23   to violate the law.  Do you understand that that's what the

24   government has to prove on Count 3?

25          THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  Okay.  Now, let me go back for a moment to

2     your rights again.  You have been accused now of committing

3     these felonies.  You have an absolute right under the

4     Constitution to insist that the government -- to go to trial

5     and then to insist that the government prove its case beyond a

6     reasonable doubt.  That trial also involves 12 citizens who

7     would be -- who would report to the court as summoned.  They

8     would be chosen totally without any prior understanding of who

9     they are, and you have a right to object to some of them if you

10    choose to do so, but ultimately, the 12 jurors who are chosen

11    to try this case have to hear all of the evidence the

12    government has to -- will present, they hear all of the

13    evidence you may have to present, or you may wish to present,

14    and then they have to decide privately, after having been

15    instructed on the law, whether they unanimously agree on each

16    count whether the government has proven you guilty beyond a

17    reasonable doubt.

18          You see, it's a very different burden from that which

19    the grand jury has.  The grand jury has to find whether there

20    was probable cause to believe.  This jury of 12 has to find

21    unanimously that you are guilty beyond a reasonable doubt.  Do

22    you understand that that's -- that is what you're giving up?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  It's a very important right.

25          THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  You have the right, as I said, to offer

2    your evidence at such a trial, but -- and including your own

3    testimony.  You also have a right not to testify, and if you

4    choose not to testify, if there were to be a trial, the jury

5    would be instructed that they may not take the fact that you

6    did not testify into account in determining whether you're

7    guilty or not, that you have an absolute right to say to the

8    government, you have accused me.  Now you prove it.  I'm not

9    going to help you by doing anything.  Do you understand?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  You have a right in the course of such a

12   trial also to cross-examine every witness that the government

13   may give -- may call to give evidence against you.  You are

14   giving that up, too.  Do you understand?

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  You have a right to have a lawyer at every

17   stage of a criminal proceeding including certainly a trial, and

18   obviously by giving up the trial, you also give up your right

19   to have a lawyer at a trial which is not.  Do you understand?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  Has anybody made any promises to you to

22   get you to plead guilty?

23          THE DEFENDANT:  No, Your Honor.

24          THE COURT:  Has anybody put any pressure on you to do

25   this?

1           THE DEFENDANT:  No, Your Honor.

2           THE COURT:  Now, let me go back again and outline to

3    you the penalties that obtain on a decision of guilty -- of

4    guilt.  There are two.  One is the maximum penalty, which is

5    defined in the statutes that also define the offense.  And in

6    this case on counts -- on the extortion counts, both conspiracy

7    and substantive extortion, the statute calls for a maximum

8    sentence of imprisonment of 20 years on each plus a period of

9    supervised release of three years, a fine of up to $250,000,

10   and then there is on each count a mandatory special assessment

11   of $100.

12           Now, on Count 3, the maximum sentence of imprisonment

13   is five years.  Again, there is a period of supervised release

14   of three years, a fine of up to $250,000, and again, the

15   assessment of $100.  These offenses also allow for the

16   government to seek forfeiture of ill-gotten gains.

17           Now, when the statute has -- when there are three

18   different statutes, the prison sentences -- the total maximum

19   prison sentences are added up.  So the total maximum in this

20   case would be 45 years.  The period of supervised release

21   remains the same for all three.  It doesn't get added.  So that

22   would be three years for all three counts.  The financial

23   penalties are also added together.  So the total maximum fine

24   is $750,000 and the total special assessment is $300.

25           Do you understand that?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Okay.  The other set of sentencing rules

3    is very different.  They are called guidelines, and the

4    guidelines operate as follows:  They look first at the offense

5    itself and assign numerical values called offense levels.  They

6    start out with the base offense level, which is the same in

7    every case depending on what the accusation is.  So extortion

8    has a particular base offense level, conspiracy has a

9    particular base offense level.  That's what we start with.  And

10   there is also a mechanism for working out duplication when you

11   have more than one count.

12          Then they look at certain factors that have to do with

13   the commission of the offense.  In this case, as the plea

14   agreement has set out, there are certain added offense levels

15   because the payment was greater than $40,000, another one

16   because the -- because the offense involved, not necessarily

17   you, but it involved an elected official.  So all of these

18   points the government in the plea agreement, which I gather you

19   agree with, were added and then some were subtracted.

20          But we start out with a base offense level of 12, add

21   6 because of the size of the payment that was made, and then

22   add another 4 because it involved a state official.  So that

23   got us to 22, I think, if my arithmetic is correct, and then we

24   subtract three levels because by pleading guilty you are deemed

25   to accept responsibility, and that takes us to a total offense

```
 1    level of 19.  The guidelines then --
 2             MR. HAFER:  I'm sorry to interrupt, Your Honor.
 3    Mr. Bailey has reserved all rights -- that's the U.S.
 4    Attorney's position on the guidelines, but Mr. Bailey has
 5    reserved all his rights.
 6             THE COURT:  So that's the government's position, and
 7    in a little while I'll come to what happens next and then I
 8    will go into what your position will be.
 9             So, in any event, that leads us to a calculation of
10    19.  I'm not exactly sure how the -- well, and then the second
11    set of facts the guidelines look at is any criminal record you
12    may have, and if there is a -- if there are prior convictions
13    for any felonies, then they are assigned again numerical
14    values, but these are called criminal history points.  No.
15    What is it called?  Categories.  Before we get to the category,
16    we get to points, and then the points are translated into one
17    of six categories.
18             Once we know what the total offense level is and what
19    criminal history category applies, we go to a grid that I'm
20    sure Mr. Bailey has shown you, right?
21             MR. BAILEY:  Yes.
22             THE COURT:  So you know -- do you remember it?
23             THE DEFENDANT:  Yes.
24             THE COURT:  Vaguely?
25             THE DEFENDANT:  Yes.
```

1          THE COURT:  But you remember you go down on the

2     vertical axis until you come to the correct offense level?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Okay.  Then you go across on the

5     horizontal level until you come to the correct criminal history

6     category, and where the two intersect, there are two numbers

7     and they represent months of imprisonment, and those are the

8     numbers that start the guideline calculation and start the

9     sentence as I need to ultimately decide.

10          I am not bound to accept those numbers.  I can go up

11     or I can go down provided I have a reason for it, and I explain

12     the reason.  Do you understand that?

13          THE DEFENDANT:  Yes, Your Honor.

14          THE COURT:  And once I've decided this, given your

15     plea agreement, you're kind of stuck with that.  You can't even

16     appeal it.  Do you understand that?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  Okay.  So I will hear the Government's

19     outline of the evidence that it would present if and when we go

20     to trial.

21          MR. HAFER:  Yes, Your Honor.

22          THE COURT:  And, Mr. Hebert -- excuse me -- the last

23     question that I will ask you is did you do it, and what did you

24     do in connection with these accusations that have been lodged

25     against you.  Do you understand?

1        THE DEFENDANT:  Yes, Your Honor.

2        THE COURT:  So listen carefully.

3        THE DEFENDANT:  Yes.

4        MR. HAFER:  Thank you, Your Honor.

5        If the case were to go to trial, Your Honor, just

6   generally, the government would prove its case with witness

7   testimony, civilian and law enforcement testimony, statements

8   of co-conspirators, statements by Fall River Mayor Jasiel

9   Correa, phone records, text records, e-mails.

10       THE COURT:  What kind of statements by the mayor?

11       MR. HAFER:  Well, co-conspirator statements he made to

12   individuals involved in the case either in person or --

13       THE COURT:  Not public statements?

14       MR. HAFER:  Correct, Your Honor, not public.

15       I have broken this down by count, and I'll do Counts 1

16   and 2 first.  Just as a summary, the government would prove

17   with respect to Counts 1 and 2 that Mr. Hebert agreed to serve

18   and did in fact serve as a middleman in extortion of Marijuana

19   Vendor Number 3.

20       THE COURT:  What was his job at the time?

21       MR. HAFER:  Mr. Hebert's?

22       THE COURT:  Was he working for the mayor?

23       MR. HAFER:  Not in any official capacity, no, Your

24   Honor.  Mr. Hebert is -- owns real estate, but no official

25   employment with the City of Fall River.

1          THE COURT:  Okay.

2          MR. HAFER:  The government will prove MJ Vendor Number

3     3's business was in and affecting interstate commerce, and that

4     essentially Mr. Hebert agreed to middleman an extortion of

5     Marijuana Vendor 3 by Jasiel Correa by obtaining money and a

6     mortgage discharge valued at approximately $91,000 in return

7     for the issuance of --

8          THE COURT:  Who was the mortgagee or the mortgagor?

9          MR. HAFER:  The brother of MJ Vendor Number 3.

10         THE COURT:  What did that have to do with Mr. Hebert?

11         MR. HAFER:  Mr. Hebert had -- MJ Vendor Number 3's

12    brother had a mortgage.  Mr. Hebert owns a lot of property.  He

13    had a loan from MJ Vendor Number 3's brother.  And essentially

14    MJ Vendor 3 went to his brother and said --

15         THE COURT:  Got it.

16         MR. HAFER:  And just to be very clear, the official

17    act here is the issuance of the nonopposition letter and the

18    host community agreement.  Let me just briefly explain what the

19    government would prove at trial on those because it goes to the

20    official act.  Massachusetts law first as established by the

21    Department of Public Health, now regulated by the Cannabis

22    Control Commission, in essence requires in order to ultimately

23    get a license to operate a marijuana business in the state, a

24    letter of nonopposition from the head of the municipality where

25    the business wants to operate, that typically states that the

1  head of the municipality has verified with the appropriate

2  officials and there's no zoning issues and that sort of thing.

3       Because these letters are essential to the marijuana

4  vendors, competition for them was fierce and substantial.  In

5  addition to the nonopposition letter, Your Honor, the

6  government would prove that applicants need what's called a

7  host community agreement, I'll abbreviate that as HCA, which is

8  essentially an agreement between the marijuana company and the

9  local government that gives the local government up to three

10  percent of proceeds from the marijuana business and an annual

11  fee of $50,000 essentially for the right to operate in that

12  city.

13       And we would prove at trial that the host community

14  agreements in Fall River were typically negotiated in

15  conjunction with the nonopposition letter.  So the two official

16  acts, the issuance of the nonopposition letter and the host

17  community agreement.

18       THE COURT:  But the host community agreement is not an

19  area agreement in this context, or is it?

20       MR. HAFER:  Well, to the extent that it was

21  precipitated --

22       THE COURT:  That wasn't --

23       MR. HAFER:  Yes, Your Honor, but facially no, but they

24  are what all businesses have.

25       The government would prove that on or about July 11,

1    2018, Mr. Hebert offered to speak to Jasiel Correa on MJ Vendor

2    Number 3's behalf in order to obtain a nonopposition letter,

3    and that, in substance, Mr. Hebert told MJ Vendor Number 3 that

4    you're going to have to start helping this kid out because he

5    is going to help you.  Initially Marijuana Vendor Number 3

6    agreed with Mr. Hebert that he would give Jasiel Correa a

7    $25,000 bribe in return for the nonopposition letter.  The

8    agreement was that that bribe payment eventually would consist

9    of two separate $12,500 contributions to Mr. Correa's campaign

10   fund and then MJ Vendor Number 3 would disguise those payments

11   through friends and family of his.

12          As the transaction of the conspiracy evolved, MJ

13   Vendor Number 3, on behalf of his brother, forgave a mortgage

14   that was held for a value of approximately $61,000 as an

15   additional payment as part of this transaction.  Mr. Hebert

16   himself also gave Jasiel Correia an additional five to six

17   thousand dollars in cash as part of the essential quid pro quo

18   here, money and other things of value in return for the

19   nonopposition letter and host community agreements.

20          The government would prove that on or about August 21,

21   2018, Mr. Hebert hand-delivered two nonopposition letters to MJ

22   Vendor Number 3.  He had two separate marijuana businesses, a

23   regular and an edibles business.  Mr. Hebert hand-delivered

24   those letters to MJ Vendor 3 -- MJ Vendor Number 3 had two

25   businesses.  That was the allegation in the information, is

1   that there were two letters of nonopposition.  MJ Vendor 3 had

2   two separate marijuana businesses, a regular and an edibles

3   business.  Mr. Hebert, we would prove, hand-delivered those

4   letters to MJ Vendor Number 3.

5          THE COURT:  This is a separate transaction from the

6   first one?

7          MR. HAFER:  Yes, Your Honor.  And he gave the letters

8   at a cigar bar, and again, that's notwithstanding that

9   Mr. Hebert didn't have any formal role in the government of

10  Fall River.

11         And, finally, the government would prove on these two

12  counts, at the direction of MJ Vendor Number 3, several members

13  of his family and friends did in fact contribute $12,500 to

14  Jasiel Correia's campaign in or about late August 2018 as

15  partial payment on the bribe, and the mortgage was in fact

16  discharged.  In or about late August 2019, the mortgage held by

17  MJ Vendor Number 3's brother was discharged.

18         With respect to Count 3, Your Honor is correct,

19  January 15th, 2019, actually here on the ninth floor of the

20  U.S. Attorney's Office in the presence of agents from several

21  federal law enforcement agencies, Mr. Hebert made false

22  statements that he was not involved in any way in the approval

23  or obtaining of nonopposition letters for marijuana businesses

24  in Fall River and stated that he had never acted as a conduit

25  in any way to get money to Jasiel Correia.  And obviously,

1    based on the proffer and the evidence with respect to Counts 1

2    and 2, the government would be able to prove that those

3    statements were in fact false and material.  That's in essence,

4    Your Honor, a summary of what the government would prove at

5    trial and how it would prove it.

6         THE COURT:  Mr. Hebert, can you please tell me in your

7    own words what, if anything, you had to do with getting money

8    from Vendor Number 3 and providing that vendor with the

9    necessary documents to operate this business.

10        THE DEFENDANT:  Yes, Your Honor.  As stated, Vendor

11   Number 3 is a close friend and business associate of mine, and

12   he requested help in obtaining a nonopposition letter.  And I

13   contacted the mayor and helped facilitate getting it, and in

14   exchanged the mayor wanted support.

15        THE COURT:  What was your position vis-a-vis the mayor

16   of the city at the time?

17        THE DEFENDANT:  I had no position.  I was a supporter.

18   I was friendly with the mayor.  We supported him campaigning

19   and so on and so forth.  The relationship was more of a

20   friendly relationship.

21        THE COURT:  So you promised to provide the

22   nonopposition letters to Vendor Number 3 in return for getting

23   paid and for getting the mortgage discharged?

24        THE DEFENDANT:  Yes.  Essentially, yes.

25        THE COURT:  Now, the mortgage discharge was your

1    mortgage, right?

2            THE DEFENDANT:  A corporation that I owned real estate

3    in, yes.

4            THE COURT:  But it had nothing to do with the city.

5    It was private for you?

6            THE DEFENDANT:  A private mortgage, yes.

7            THE COURT:  And the money that the five -- five or six

8    thousand dollars, where did that ultimately go?

9            THE DEFENDANT:  I gave that to the mayor.

10           THE COURT:  I'm sorry?

11           THE DEFENDANT:  I gave that to Mayor Jasiel Correia.

12           THE COURT:  And then did you in fact deliver to Vendor

13   Number 3 the nonopposition letters that it needed to get going?

14           THE DEFENDANT:  Yes, I did.

15           THE COURT:  And did you on another occasion deliver to

16   that Vendor Number 3 nonopposition letters with respect to a

17   cigar shop or is that a separate shop?

18           MR. HAFER:  I'm sorry.  I don't think I was clear

19   enough.  On one occasion Mr. Hebert delivered two letters at

20   the cigar shop to Vendor 3 for two separate marijuana

21   businesses, but it was one occasion, two letters, two

22   businesses.

23           THE COURT:  Oh, okay.

24           So did --

25           THE DEFENDANT:  Sorry, Your Honor.  Just to be clear,

```
1    I also delivered $12,500 in campaign donations from MJ Vendor
2    Number 3 to the mayor made out to his campaign.
3            THE COURT:  And did you try to get this money or did
4    you get the money from Vendor Number 3 and/or his or her family
5    by again promising to give these nonopposition letters?
6            THE DEFENDANT:  Yes, that was the essence.
7            THE COURT:  That was part of the deal?
8            THE DEFENDANT:  That was part of the deal, Your Honor,
9    yes.
10           THE COURT:  Did you know it was against the law to do
11   that?
12           THE DEFENDANT:  I wasn't thinking properly.  I'm
13   sorry, yes.  Yes.
14           THE COURT:  Now, Count 3 is somewhat different.  Here
15   that apparently pertains to something that happened after the
16   government decided to investigate, and here the accusation is
17   that you gave false information about what in fact you did to
18   the agents who were investigating the situation, specifically
19   you said that -- you told them that you were not involved in
20   any approval and opening of the marijuana dispensaries and that
21   you had never acted as a financial conduit for Mr. Correa.  Do
22   you acknowledge that you did in fact mislead or try to mislead
23   the agents?
24           THE DEFENDANT:  Yes, Your Honor.
25           THE COURT:  And what were the statements not
```

1  correct -- I mean, did you make these statements and were they

2  not honest?

3            THE DEFENDANT:  Yes, Your Honor.

4            THE COURT:  And did you know that they were not true?

5            THE DEFENDANT:  Yes, Your Honor.

6            THE COURT:  I find that the defendant understands the

7  nature of the charges as well as the maximum penalty.  I

8  further find that the plea is voluntary and that there is a

9  factual basis for it and will, therefore, accept it as to

10  Counts 1, 2 and 3.

11            Now, sentencing, Lisa?

12            THE CLERK:  Yes.  So I was looking -- what about

13  December 12th at 2:00?

14            MR. HAFER:  Your Honor, I don't have any objection to

15  the date being set now but just -- I have no objection to that

16  date being set.  I think that's the best way to say it at this

17  point.

18            MR. BAILEY:  That date works for the defense as well,

19  Your Honor.

20            THE COURT:  I'm sorry.  December 12th works for

21  everybody?

22            MR. BAILEY:  Yes, it does.

23            THE COURT:  So that is the next time, Mr. Hebert, when

24  we will meet, and between -- and the reason for the long delay

25  is that the case will now go to the Probation Office where a

1    probation officer will prepare what is called a presentence

2    report.  It is very extensive.  It talks about the offense, it

3    talks about any other people who may be involved, and it tells

4    me a lot about you, your personal background, physical and

5    mental health and so on, and it takes them that long to prepare

6    this report.

7           You will have an opportunity to see it before we next

8    get together.  I ask you please to read it carefully.  If there

9    are mistakes in it, let Mr. Bailey know so that they can be

10   corrected before we next get together.  Okay?

11          THE DEFENDANT:  Yes, Your Honor.

12          THE COURT:  Now, what about bail?

13          MR. HAFER:  Your Honor, I think Mr. Bailey and I are

14   in agreement on the core conditions with the assistance of

15   Probation.  The government is not seeking detention.  The

16   government is seeking an unsecured bond of $50,000.  I think we

17   are all in agreement on that, and then beyond that the

18   conditions set forth on Page 5 of the pretrial services report

19   are all agreeable to the government.

20          MR. BAILEY:  And they're agreeable to the defendant as

21   well, Your Honor, and they do include travel restricting --

22   being restricted to the continental United States.  Mr. Hebert

23   does have his passport with him.  He's prepared to surrender it

24   at this point, and he is ready also to sign the unsecured

25   appearance bond.

1          THE COURT:  Well, the list that Probation has or

2    Pretrial Services has includes travel restricted to the

3    continental U.S.  That's not a problem?

4          MR. BAILEY:  No.  I said it does include it.  So we

5    agree with that.  I'm sorry.  I was inarticulate there.

6          THE COURT:  Okay.  If there's a problem with that, he

7    can always seek relief, and I assume there would be no

8    difficulty in getting it.

9          MR. BAILEY:  Yes.

10         THE COURT:  All right.  So you are free to go

11   provided, Mr. Hebert, that you sign a bond that will say that

12   you are responsible for $50,000 if for one reason or another

13   you don't show up at the next hearing or in any way violate any

14   conditions.  And in addition to that, you shall report to

15   Pretrial Services, as directed by them, and they will work out

16   with you a schedule for making sure what's going on.

17         You shall not use or -- well, use any unlawful or

18   possess any unlawful narcotic drugs or other controlled

19   substances unless they're prescribed by some doctor, and that

20   includes marijuana.  You shall submit to any testing of the use

21   of unlawful drugs by Probation or Pretrial Services, and that

22   may be random, but whenever they want you to do it, do it.  And

23   you shall refrain from obstructing or attempting to obstruct in

24   any manner any of this testing and monitoring.  There are

25   various ways in which people do this, but if they want you to

1    do it, do it honestly and straight.  Any passport you have, you

2    shall surrender to Probation.  You shall not obtain a passport

3    or other travel documents without first getting permission from

4    Probation during this period of time.  And you may travel

5    within the continental United States, but if you need to go

6    outside the country, get permission first.

7         You shall avoid all contact, direct or indirect, with

8    any person who is or may be a victim or potential witness in

9    the investigation or prosecution of this case, including but

10   not limited to co-conspirators unless in the presence of

11   counsel.  Co-conspirators are people like Mr. Correia.

12        MR. BAILEY:  Judge, with regard to that, Fall River,

13   being a very small city, and my client being a business --

14        THE COURT:  I'm sorry?

15        MR. BAILEY:  Fall River being a small city and my

16   client being a business person, we expect a list from the

17   government so --

18        MR. HAFER:  Yes.  Yes, Your Honor.  I'll provide --

19        THE COURT:  So a list of people that you shouldn't

20   deal with will be given to you and you shall abide by it.

21        MR. BAILEY:  Thank you, Your Honor.

22        THE COURT:  And, finally, there are a bunch of

23   statutory conditions which you shall also observe, and I think

24   your next step -- has he gone to the marshal yet?

25        MR. BAILEY:  He's been fingerprinted and given a DNA

1  swab, but I believe he still has to be photographed in the

2  marshal's office.

3          THE COURT:  So you should please take care of that

4  when you leave here, and also connect with Ms. Hennemann in

5  Pretrial Services so that all of the documentation she needs

6  can be effectively executed.

7          MR. BAILEY:  Yes, Your Honor.

8          THE COURT:  Is there anything else?

9          MR. HAFER:  Not from us, Your Honor.

10          THE COURT:  Anything from you?

11          U.S. PROBATION:  No.  Thank you, Your Honor.

12          MR. BAILEY:  Thank you, Your Honor.

13          THE COURT:  And that's it.  And I thank you, and thank

14  you for your good outline of the evidence.

15          MR. HAFER:  Thank you, Your Honor.

16          THE COURT:  And we are now in recess.

17          THE DEFENDANT:  Thank you, Your Honor.

18          (Adjourned, 11:48 a.m.)

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF OFFICIAL REPORTER

 2

 3         I, Linda Walsh, Registered Professional Reporter

 4   and Certified Realtime Reporter, in and for the United States

 5   District Court for the District of Massachusetts, do hereby

 6   certify that the foregoing transcript is a true and correct

 7   transcript of the stenographically reported proceedings held in

 8   the above-entitled matter to the best of my skill and ability.

 9              Dated this 11th day of March, 2020.

10

11

12         /s/ Linda Walsh_____

13         Linda Walsh, RPR, CRR

14         Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```